UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

| | |
|---|---|
| **MELVIN WILMER DIAZ-CALDERON**, <br><br> Petitioner, <br><br> vs. <br><br> **WILLIAM P. BARR, in his official capacity as the Attorney General of the United States, et al.**, <br><br> Respondents. | 2:20-CV-11235-TGB <br><br><br> **ORDER GRANTING IN PART PETITIONER'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (ECF NO. 2)** |

The Petitioner in this case is a Guatemalan native who seeks habeas corpus relief to be released from prolonged detention by Immigration and Customs Enforcement ("ICE") and the Department of Homeland Security ("DHS"). The situation of Petitioner Melvin Wilmer Diaz-Calderon ("Diaz") is somewhat unusual. He has been granted Special Immigrant Juvenile ("SIJ") status by the United States and is currently eligible to receive a visa that could allow him to adjust his immigration status to that of a permanent resident. Yet, because he was previously wrongly removed from the United States in violation of a federal court's injunction, and then later ordered by that same court returned to the United States, but without an Immigration Judge ever

1

reconsidering the basis of his detention upon his return, he remains in the custody of the Immigration authorities as he awaits the decision of an appeal seeking to reopen his removal decision—an appeal that the government no longer opposes.  For the reasons set out in detail below, the Court orders that Diaz be given a hearing within 14 days on the issue of his detention, or that he be released.

Diaz initially filed a petition for habeas corpus under 28 U.S.C. § 2241 seeking to challenge his removal order, pending deportation, and his detention. Along with his petition, Diaz filed a motion for temporary restraining order and preliminary injunction, also seeking a stay of his removal order and release from detention. ECF No. 2. The respondents in Petitioner's action are Attorney General William P. Barr, Field Office Director Rebecca Adducci of the Detroit Field Office of ICE, Acting DHS Secretary Chad Wolf, and Acting Director of ICE Matthew Albence ("Respondents"). ECF No. 1, PageID.6-7.  This Court temporarily stayed Diaz's deportation while it considered his emergency motion. ECF No. 5. The motion was fully briefed. On the eve of the hearing on the TRO motion, Respondents filed a supplemental brief stating, among other things, that ICE agreed *not* to remove Petitioner while his motion to reopen is pending before the Bureau of Immigration Appeals ("BIA"). In light of their position, Respondents contended that the issue of whether to stay removal was rendered moot. *Id.*  On the remaining issue of Petitioner's challenge to detention, the Court ordered additional briefing

2

on both the merits of the issue and jurisdiction. Having carefully reviewed the briefing of the parties, and considering their oral arguments as presented at the hearings, the Court finds both that it has jurisdiction and that the motion for temporary restraining order and preliminary injunction should be **GRANTED IN PART**. Accordingly, the Court will **ORDER** that Respondents shall provide Diaz with a bond or custody redetermination hearing before an Immigration Judge within 14 days of the entry of this Order, and if no such hearing is conducted within that time, shall release him forthwith. At the bond or custody redetermination hearing before an Immigration Judge, Respondents must justify Diaz's continued detention by clear and convincing evidence.

## I. Facts & Procedural History

### A.   Diaz's early life in Guatemala

Petitioner is a 24-year-old native of Guatemala, who was born on January 31, 1996. ECF No. 1, PageID.7. Diaz does not know his father, a man who raped his mother, causing her to become pregnant with him. *Id.* Diaz was raised by his grandparents, who were unable to care for him and abused him, after Diaz's mother abandoned him at the age of two. *Id.* Diaz was forced to drop out of school in the sixth grade to care for himself and his grandparents, and from a young age fought off gang recruitment. *Id.* at PageID.7-8. Due to the abuse and the death threats he received for refusing to join a gang, Diaz unlawfully entered the

United States in July 2012, at the age of 17, to live with his cousin, Kevin Sergio Diaz Mazariegos, in California. *Id.*

## B. California probate court appoints a legal guardian for Diaz and makes a special finding that it is not in his best interest to be removed from the United States

Congress established Special Immigrant Juvenile ("SIJ") status in 1990 as a humanitarian protection to allow abused, abandoned, and neglected children to remain in the United States with a pathway to permanent residency.  8 U.S.C. §§ 1101(b)(1), 1101(a)(7)(J). SIJ petitions are reviewed by the United States Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security. *Osorio-Martinez v. Attorney Gen. United States of Am.*, 893 F.3d 153, 163 (3d Cir. 2018). According to the statute, an SIJ is "an immigrant who is present in the United States":

> (i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;

> (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and

> (iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status[.]

4

8 U.S.C. § 1101(a)(27)(J). An individual is eligible for classification as a special immigrant under § 1101(a)(27)(J) if he or she "[i]s under twenty-one years of age[.]" 8 C.F.R. 204.11(c). Congress has amended the statute conferring SIJ status—currently codified at 8 U.S.C. § 1101(a)(27)(J)—many times over its thirty-year history. *Joshua M. v. Barr*, --- F. Supp. 3d ---, 2020 WL 836606 at *15 (E.D. Va. Feb. 20, 2020). And Congress has consistently engaged in "efforts to expand eligibility for SIJ status and increase protections for vulnerable immigrant children." *Id.* (quoting *Perez v. Ciccinelli*, 949 F.3d 865, 878 (4th Cir. 2020)).

In December of 2016, when Diaz was 20 years old, the Probate Court for Marin County in California appointed Diaz's cousin as his guardian. ECF No. 1-3. The Probate Court found that Diaz should not return to Guatemala because his grandparents had abused him, and his mother had failed to protect him from them. *Id.* These findings were then submitted to USCIS in support of Diaz's SIJ status petition under § 1101(a)(27)(J)(i)-(ii). Then, on January 23, 2017, based on the California court's SIJ findings, Diaz submitted an "I-360" SIJ status petition to USCIS.

Unbeknownst to Diaz, in the summer of 2017, USCIS began delaying SIJ status petitions made by individuals between 18-20 years old, despite the fact that normally they would be processed within 180 days. ECF No. 35-1, PageID.548. Then, in February of 2018, USCIS announced a new policy that it would deny SIJ status petitions for

5

children like Diaz whose SIJ findings were made by California probate courts when the child was between the ages of 18 and 20. *Id.* Following this announcement, a group of SIJ applicants like Diaz, filed a class action lawsuit in the United States District Court for the Northern District of California, challenging USCIS' policy. *J.L. v. Cuccinelli*, No. 5:18-cv-04914-NC (N.D. Ca.) ("*J.L.* litigation").[1]

On September 13, 2018, USCIS issued a Notice of Intent to Deny Diaz's SIJ petition based on the policy described above because Diaz submitted his I-360 application after he turned 18. ECF No. 1-4. It appears that at this point, once he learned his SIJ application would be denied, Diaz relocated to Michigan. Meanwhile, on October 24, 2018, the court in the *J.L.* litigation granted a preliminary injunction. ECF No. 35-1. This preliminary injunction enjoined and restrained the DHS and USCIS:

1. From denying Special Immigrant Juvenile Status pursuant to 8 U.S.C. § 1101(a)(27)(J) on the ground that a California Probate Court does not have jurisdiction or authority to "reunify" an 18-to 20-year old immigrant with his or her parents;

2. From initiating removal proceedings against or removing any Special Immigrant Juvenile Status petitioner who was appointed a guardian pursuant to § 1510.1(a) of the California Probate Code and whose Special Immigrant Juvenile Status petition has been denied on the grounds that the California Probate Court

---

[1] The Southern District of New York reached the same conclusion in *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350 (S.D.N.Y. 2019).

did not have jurisdiction or authority to "reunify" an 18-
to 20-year-old immigrant with his or her parents; and

3.     To provide no less than 14 days notice to Plaintiffs'
       counsel    before    Defendants    take    any    adverse
       adjudicatory or enforcement action against any of the
       individual Plaintiffs or members of the Proposed Class.

*Id.* at PageID.570. In February of 2019, the court in *J.L.* also granted the

plaintiffs' motion for class certification of the following class definition:

Children who have received or will receive guardianship
orders pursuant to California Probate Code § 1510.1(a) and
who have received or will receive denials of their SIJ status
petitions on the grounds that the state court that issued the
SIJ findings lacked jurisdiction because the court did not have
the authority to reunify the children with their parents.

*J.L. v. Cissna*, 5:18-cv-04914-NC, ECF No. 112 (N.D. Ca. Feb. 1, 2019). It

is undisputed that Diaz is a member of the *J.L.* litigation Proposed Class.

## C.    Diaz is removed from the United States to Guatemala despite his membership in the *J.L.* class and the preliminary injunction enjoining his removal

On April 16, 2019, Diaz was arrested in Michigan for operating a

vehicle while intoxicated ("OUI"). ECF No. 19-1.[2] The following day he

was convicted and sentenced to two days confinement and a fine. On April

---

[2] Respondents filed a declaration from Deportation Officer Nua Lulgjuraj, describing
the arrest with their response to Petitioner's motion. ECF No. 15-2. Respondents then
supplemented the Lulgjuraj Declaration by attaching the police report from Diaz's
arrest. ECF No. 19. Petitioner moves to strike portions of the original declaration,
ECF No. 15-2, arguing that it contains unsubstantiated allegations related to Diaz's
arrest that were not the basis for any charge. ECF No. 20. The Court **DENIES**
Petitioner's motion to strike, as this is an exceptional remedy. *Wrench LLC v. Taco
Bell Corp.*, 36 F. Supp. 2d 787, 789 (W.D. Mich. 1998); Fed. R. Civ. P. 12(f). The Court
will give appropriate weight to Petitioner's conviction, but not to extraneous conduct
not part of the offense of conviction.

18, 2019, ICE arrested Diaz at the Monroe County Jail in Van Buren, Michigan and initiated removal proceedings against him. ECF No. 15-1, PageID.337. ICE charged him as removable pursuant to 8 U.S.C. § 1182(a)(6)(A)(i), which states that "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." *See also* Notice to Appear, ECF No. 1-2. Diaz then made several appearances before the Immigration Judge in Detroit during May and June 2019, remaining in ICE custody throughout that time. ECF No. 15-2, PageID.337. On June 5, 2019, Diaz appeared with counsel and conceded that he was removable under § 1182(a)(6)(A)(i) but expressed an intention to file an Application for Asylum and Withholding of Removal. *Id.* at PageID.338. On June 26, 2019, Diaz appeared again with counsel for the Immigration Judge to consider his request for a change in custody, as he was still detained by ICE at the Monroe County Jail. *Id.*

The Immigration Judge denied Diaz's request for a custody redetermination. The Immigration Judge cited what at the time was Diaz's "recent pending operating while intoxicated arrest along with other criminal encounters, and also due to [Diaz's] apparent lack of relief availability." ECF 1-10, PageID.88. Because DHS and USCIS failed to notify Diaz or the Immigration Judge of the *J.L.* class litigation or the fact that Diaz qualified as a member of the class, Diaz was not aware of his membership in the *J.L.* class, nor that DHS and USCIS were enjoined

8

from initiating removal proceedings against him. Diaz claims that because at the time he did not believe he had any legal right to stay in the country and he was experiencing mental anguish while incarcerated, he withdrew all of his pending applications and agreed to voluntary departure. ECF No. 1, PageID.9. Diaz waived his appeal of the Immigration Judge's custody redetermination. *Id.* Diaz was removed from the United States to Guatemala, in violation of the *J.L.* injunction, on July 24, 2019. *Id.*

**D. The *J.L.* court learns of Diaz' unlawful removal and orders USCIS to parole Diaz back into the United States and grant him Special Immigrant Juvenile status**

While in Guatemala, Diaz alleges that he faced additional abuse from gang members who attempted, unsuccessfully, to recruit him. ECF No. 1, PageID10. He claims that a group of men attacked him, and he had to be hospitalized for his injuries. *Id.* Meanwhile, in December of 2019, the parties in the *J.L.* litigation filed a joint notice with the court, explaining that in November a class member—not Diaz—was removed from the country contrary to the injunction. ECF No. 35-3, PageID.601-02. Throughout December 2019 and January 2020, the *J.L.* parties learned of a handful of additional class members who had been removed, including Petitioner Diaz. *Id.* On February 14, 2020, the *J.L.* court held DHS and USCIS in contempt for removing the class members and ordered the government to facilitate Diaz's immediate return to the

United States. *Id.* at PageID.602-04.[3] The court found that the government had ample ability to control ICE's actions and ensure full compliance with the injunction. *Id.*

On February 27, 2020, Diaz was granted "Significant Benefit Parole," valid until March 6, 2020, authorizing his entry into the United States with a form of temporary parole status. ECF No. 15-2. Diaz entered the country via Texas and was then transferred to the Monroe County Jail in Michigan. On March 5, 2020, USCIS granted Diaz's "I-360" SIJ status petition, more than three years after he submitted it. ECF No. 1-7. Because Diaz's I-360 had been granted, the only thing preventing Diaz from applying for an adjustment of status to Lawful Permanent Resident Status, also known as a Form I-485, was the availability of a visa to do so. ECF No. 1, PageID.30, n.5. Visas are granted on a priority basis, as calculated by the date the individual filed their I-360 SIJ petition. *Id.* With an application date of January 23, 2017, Diaz's visa was slated to become current on July 1, 2020. ECF No. 27, PageID.470.

---

[3] Respondents contend that Diaz's removal from the United States only violated the portion of the preliminary injunction enjoining the government from "provid[ing] no less than 14 days notice to Plaintiffs' counsel before Defendants take any adverse adjudicatory or enforcement action against any of the individual Plaintiffs or members of the Proposed Class." ECF No. 32, PageID.523. But the terms of the preliminary injunction also enjoined the government from initiating any removal proceedings against members of the Proposed Class. ECF No. 35-1, PageID.570. It therefore appears that the government's violation of the injunction was not merely a matter of failing to provide timely notice.

**E.      Diaz files a Motion to Reopen his removal proceedings and to terminate his order of removal**

With his newly granted SIJ petition, Diaz filed a Motion to Reopen his removal proceedings with the Immigration Judge. ECF No. ECF No. 1-8. Diaz argued that he was no longer inadmissible as originally charged in 2019 and therefore the order of removal should be terminated. More specifically, Diaz was originally ordered removed pursuant to § 1182(a)(6)(A)(i), for being present in the United States without being admitted or paroled. Diaz argued that this basis of inadmissibility no longer applied to him by operation of 8 U.S.C. § 1255(h), which paroles Special Immigrant Juveniles into the United States so that they may adjust their status to permanent residency. It also waives a number of inadmissibility grounds, including § 1182(a)(6)(A)(i), the ground upon which Diaz had been found inadmissible. § 1255(h). Diaz also moved for a stay of his removal, which the Immigration Judge granted temporarily, while he decided Diaz's motion. Diaz alleges that pursuant to a settlement agreement in the *J.L.* litigation, USCIS requested that ICE join, or at a minimum not oppose, Diaz's Motion to Reopen based on his SIJ status. ECF No. 1, PageID.12. For reasons unknown, ICE denied its sister agency's request and instead filed an opposition to the reopening of Diaz's case. *Id.*

On April 29, 2020, the Immigration Judge denied Diaz's Motion to Reopen. ECF No. 1-10. He disagreed with Diaz's argument that § 1255(h)

deemed him paroled into the United States. *Id.* at PageID.89. Because Diaz could not apply for adjustment of status under § 1255 until a visa became available, § 1255(h)'s parole protections did not apply to him. *Id.* Until Diaz had a visa, the Immigration Judge ruled, his SIJ status could not prevent his removal. *Id.* at PageID.89-91. The Immigration Judge also reasoned that the parole mechanism used to bring Diaz back to the United States on March 5, 2020, formally expired and that his status therefore reverted from parolee to an individual inadmissible under § 1182(a)(6)(A)(i). *Id.* Finally, the Immigration Judge found that conditions in Guatemala had not materially changed to warrant the reopening of his immigration case, or that a sua sponte reopening was warranted. *Id.* In addition to denying Diaz's Motion to Reopen, the Immigration Judge lifted Diaz's stay of removal. *Id.* at PageID.92.

## F. Diaz files his habeas petition in this court seeking a stay of removal and release from detention and simultaneously appeals the IJ's decision to the BIA

Diaz then appealed the Immigration Judge's denial to the Bureau of Immigration Appeals ("BIA") and also sought an Emergency Motion to Stay Removal with the BIA. ECF Nos. 1-11, 1-12. While his appeal with the BIA was pending, Diaz filed a verified petition for a writ of habeas corpus and a motion for temporary restraining order and preliminary injunction in this Court, seeking a stay of his removal and immediate release from detention, arguing that if he were removed from the United

States before he received a visa and moved for an adjustment of status, he would effectively be forfeiting his SIJ status and statutorily-conferred opportunity to apply for permanent residency. ECF Nos. 1-2. Diaz argued that his deportation was imminent and that this Court had jurisdiction to intervene and stay his removal. *Id.* The following day this Court issued an Order Temporarily Staying Deportation while the Court considered Diaz's motion. ECF No. 5. The Court issued an expedited briefing schedule, from which the parties sought a stipulated to extension of time. ECF No. 7.

### G. A visa becomes available and Respondents file a stipulation not to oppose re-opening of removal, rendering the question of Diaz's continued detention the only live issue in his Petition

On the morning of the Court's scheduled hearing on Petitioner's motion for temporary restraining order and preliminary injunction, Respondents filed a supplemental brief with the Court indicating that as of July 1, 2020, Diaz had a current visa priority date, making him eligible for a visa. ECF No. 27, PageID.470. Respondents stated that because of the visa, DHS would be filing a non-opposition to Petitioner's motion to reopen his removal proceedings and his request for a stay of removal with the BIA. *Id.* They further stated that ICE now agrees not to remove Petitioner while the BIA appeal is pending. *Id.* Respondents contended that the dispute between the parties about whether grant a stay of removal was therefore moot. *Id.*

At the hearing, the Court ordered Respondents to file a stipulation stating this position in writing, which they did. *See* ECF No. 28. Petitioner then pointed out that despite the stipulation the Court still needed to address the issue of Diaz's prolonged detention in ICE custody. Count VI of the Petition alleges that Diaz's prolonged detention violates procedural due process. ECF No. 1, PageID.30-36. And Count VII of the Petition alleges that Diaz's continued detention in the midst of the COVID-19 pandemic violates his due process rights under the Fifth Amendment, specifically his right to reasonable safety in government custody. *Id.* at PageID.36-37. Because the question of detention was not thoroughly briefed, the Court requested supplemental briefing, which the parties supplied. *See* ECF Nos. 30-33.

## II. Standard of Review

The standards for temporary restraining orders and preliminary injunctions in this Circuit are well-settled. And the decision to grant or deny a preliminary injunction falls within the district court's discretion. *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018). A court considers four factors when deciding whether to issue a preliminary injunction: (1) the moving party's likelihood of success on the merits; (2) the irreparable harm to the moving party absent an injunction; (3) the substantial harm to the public if an injunction were granted; and (4) whether an injunction would serve the public's interest. *Id.* (citing *S. Glazer's Distrib. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017)). Each

factor is not a prerequisite for an injunction; rather, the Court must balance the factors when deciding whether to issue an injunction. *Great Lakes Brewing*, 860 F.3d at 849. When the government is a party, the final two factors for a preliminary injunction merge. *Niken v. Holder*, 556 U.S. 418, 435 (2009); *Gun Owners of America v. Barr*, 363 F. Supp. 3d 823, 826 (W.D. Mich. 2019).

### III. Analysis

### A.    Jurisdiction over Diaz's Detention

Federal district courts are courts of limited jurisdiction. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). Thus, this Court must determine whether it has jurisdiction over the claims at issue. *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'") (quoting *Mansfield C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)). "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation. . . ." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) (citing Fed. R. Civ. P. 12(b)(1)).

### 1.   28 U.S.C. § 2241 as the source of federal habeas jurisdiction

Diaz contends that this Court has jurisdiction to release him from detention pursuant to 28 U.S.C. §2241 (habeas corpus) and the Due Process Clause of the Fifth Amendment to the United States Constitution, 28 U.S.C. § 1331 (federal question). ECF No. 30, PageID.481-84. Section 2241 of Title 28 of the United States Code provides a district court with jurisdiction over petitions for habeas corpus where a petitioner is "in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2241(c)(3). "For over 100 years, habeas corpus has been recognized as the vehicle through which noncitizens may challenge the fact of their detention." *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *2 (E.D. Mich. Apr. 6, 2020). This was confirmed recently by the Supreme Court in *Department of Homeland Security v. Thuraissigiam*, where the Court stated that "[h]abeas has traditionally been a means to secure *release* from unlawful detention." 140 S. Ct. 1959, 1963 (2020) (emphasis in original). Indeed, the Court reiterated: "[i]t is clear . . . from the common-law history of the writ . . . that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Id.* at 1969 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)). A challenge to

16

*detention*, like the one lodged here by Diaz, is therefore precisely the kind of relief traditionally sought in a habeas corpus petition.[4]

## 2. The effect of "jurisdiction-stripping" provisions of the Immigration and Naturalization Act

While § 2241 is a source of federal jurisdiction because Diaz is challenging the fact of his detention, the Court must consider the impact of federal immigration statutes because Petitioner is a noncitizen who is arguably in removal proceedings with Respondents. There are several statutes within the Immigration and Naturalization Act ("INA") that divest the district court's authority to hear cases in the immigration context, including under § 2241, and this Court must determine whether any of them apply to the unique circumstances of Diaz's case.

Two primary statutes govern the detention of aliens: 8 U.S.C. § 1226 and 8 U.S.C. § 1231. Section 1226, titled Apprehension and Detention of Aliens, states under Subsection a:

(a) Arrest, detention, and release

On a warrant issued by the Attorney General, an alien *may* be arrested and detained *pending a decision on whether the alien is to be removed from the United States*. Except as

---

[4] Respondents contend that Diaz is challenging the conditions of confinement, and therefore a § 2241 petition is not the appropriate vehicle for his claim. But "Supreme Court and Sixth Circuit precedent support the conclusion that where a petitioner claims no set of conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions of her confinement, and therefore is cognizable in habeas." *Malam*, 2020 WL 1672662, at *3. *See also Wilson v. Williams*, 961 F.3d 829, 837-38 (6th Cir. 2020).

provided in subsection (c) and pending such decision, the Attorney General—

(1) may continue to detain the arrested alien; and

(2) may release the alien on—

(A) bond of at least $1,500 with security approved by, and containing conditions proscribed by, the Attorney General; or

(B) conditional parole[.]

§ 1226(a) (emphasis added). Under this provision, when an alien has been arrested and is waiting for a decision on whether they will be removed from the United States, the Attorney General has the discretionary authority to detain them or release them on bond. However, a subsequent section of the same statute *requires* the Attorney General to detain those aliens who have committed certain serious offenses. Section 1226(c) provides as follows:

(1) Custody

The Attorney General *shall* take into custody any alien who—

(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title…

§ 1226(c) (emphasis added).

And pursuant to § 1226(e), the Attorney General's discretionary decision-making under this section is not subject to judicial review:

(e) Judicial review

*The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review.* No court may set aside any action or decision by the Attorney General under this section regarding the detention or release

18

of any alien or the grant, revocation, or denial of bond or parole.

§ 1226(e) (emphasis added). In accordance with this provision, therefore, a federal district court would not have jurisdiction to hear a challenge to a discretionary decision to hold an alien in custody during the period between his arrest and the removal decision.

Section 1231, titled Detention and Removal of Aliens Ordered Removed, contains authorities relating to detention of aliens after they have been ordered removed.  Section 1231(a) provides in relevant part:

(a) Detention, release, and removal of aliens ordered removed

(1) Removal period

(A) In general

Except as otherwise provided in this section, *when an alien is ordered removed,* the Attorney General *shall* remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").

(B) Beginning of period

The removal period begins on the latest of the following:

(i) The date the order of removal becomes administratively final.

(ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

(iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

. . .

(2) Detention

*During the removal period, the Attorney General shall detain the alien.* Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3)(B) of this title or deportable under section 1227(a)(2) or 1227(a)(4)(B) of this title.

(3) Supervision after 90-day period

If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision *under the regulations prescribed by the Attorney General.* . . .

. . .

(5) Reinstatement of removal orders against aliens illegally reentering

If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

(6) An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, *may* be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

§ 1231(a)(1), (2), (3), (5), (6) (emphases added). As the above provisions of § 1231 show, that section applies once a final order of removal is in place. Section 1226, in contrast, applies during the period between when an alien is arrested and while the Attorney General is determining whether the alien should be removed. *See Martinez v. Larose*, No. 19-3908, --- F.3d ---, 2020 WL 4282158, at *3 (6th Cir. July 27, 2020).

Here, Respondents contend that Diaz is currently being detained under § 1231(a)(2) because he is subject to a final order of removal that was entered in June of 2019. Unlike § 1226, § 1231 does not contain a section limiting a district court's power to review a detention order of an alien who has been ordered removed.  At the same time, the Supreme Court has upheld post-removal detention decisions under § 1231(a) against habeas challenges for periods of up to six months, with the qualification that beyond that time period the government must be able to   demonstrate that the alien's removal is "reasonably foreseeable." *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). Arguing that Diaz has been detained for less than six months under § 1231(a)(1)(B), Respondents contend that this Court has no authority to order Diaz's release from detention.

In the alternative, Respondents contend that if the final order of removal is no longer enforceable, Diaz may nevertheless be continued in detention under § 1226(a).  Here, the government's argument is that the Immigration Judge initially detained Diaz under § 1226(a) as both a

21

flight risk and a danger to the community, and that this was a discretionary determination by the Immigration Judge. As such, Respondents contend, it is a custody determination decision that this Court does not have jurisdiction to circumvent under § 1226(e).

In response, Diaz maintains that neither of these statutory authorities allowing for detention apply to his situation, that there is no current statutory authority supporting his detention and that he is therefore being detained indefinitely and illegally. Therefore, Diaz argues, under the Court's general § 2241 habeas authority, the Court has the jurisdiction to release Diaz from this unlawful detention.

Diaz argues that neither § 1231 nor §1226 provide authority that would justify his detention under the unique circumstances of this case. As to § 1231, Diaz argues that no final order of removal is currently pending because the removal order that was executed when he was removed in July 2019 was not reinstated under § 1231(a)(5). That section of § 1231 provides that an order of removal will be reinstated when an alien who has been removed reenters the United States illegally. Diaz did not reenter the country illegally—he was paroled into the United States *by Respondents* by court order. If Diaz is not subject to a reinstated removal order, then the detention authorities provided in § 1231(a)(2) and § 1231(a)(6) cannot form a basis for detention, because they apply to an alien who has been ordered removed.

As to § 1226(a), Diaz contends that it also cannot form a basis for detention because the Immigration Judge's detention decision, made in April 2019 before an order of removal was entered, before Diaz's SIJ status application was granted, and before Diaz's visa became current, cannot simply extend *ad infinitum* when so many material circumstances and events have intervened.

In response, Respondents nevertheless maintain that the jurisdiction-stripping provision of § 1226(e) divests this Court of jurisdiction to review the Immigration Judge's discretionary detention determination. The Court will address these points and counterpoints raised by the parties in detail.

### i.    8 U.S.C. § 1231(a)(5)

First, the Court will consider whether it has jurisdiction to consider Diaz's detention under *Zadvydas.* 533 U.S. at 701 (explaining that when the government is detaining an individual subject to a final order of removal, there exists a 6-month presumption of reasonable detention). The rule in *Zadvydas* only applies, however, if a final order of removal exists, and that is because such an order is necessary in the first instance to allow detention under § 1231. As to that question, this Court has jurisdiction to consider "the existence of a removal order in a § 2241 habeas proceeding in district court." *Casillas v. Holder*, 656 F.3d 273, 276 (6th Cir. 2011). Jurisdiction under § 2241 to consider whether an order of removal exists is not barred by 8 U.S.C. § 1252, another jurisdiction-

stripping provision found in the INA which divests district courts of jurisdiction to consider an alien's challenge to the removal process itself. Section 1252(g) takes away a district court's ability to hear "any cause or claim by or on behalf of any alien arising from the decision or action of the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." 8 U.S.C. § 1252(g). But this does not prevent a district court from considering cases where the question is whether any order of removal even exists. *See also Kumarasamy v. Atty. Gen.*, 453 F.3d 169, 172 (3d Cir. 2006) ("Kumarasamy is not seeking review of an order of removal. Rather, he claims that his deportation was illegal because there was no order of removal.") (emphasis in original); *Madu v. U.S. Atty. Gen.*, 470 F.3d 1362, 1366 (11th Cir. 2006) ("We join the Third Circuit in holding that a petitioner who contests the very existence of an order of removal does not seek 'review of an order of removal' within the meaning of the REAL ID Act."); *Alvarez-Lopez v. Adducci*, No. 12-11952, 2012 WL 2407702, at *3 (E.D. Mich. June 26, 2012) ("*Casillas*, *Madu*, and *Kumarasamy* instruct this Court that it has jurisdiction over Petitioner's challenge to the existence of an order of removal."). Here, Diaz claims his detention is unlawful because there is no final order of removal in existence which mandates, or even permits, detention under § 1231.

The Court agrees with Diaz that the authority provided in § 1231(a)(5) to reinstate an order of removal does not apply here and

24

cannot make it such that § 1231(a)(2) and (a)(6) provide a legal basis for Diaz's detention. The final order of removal was executed in Diaz's case on July 24, 2019, when he was removed to Guatemala. That final order of removal was not automatically reinstated when Diaz was paroled back into the United States pursuant to the court order in *J.L.* because, under § 1231(a)(5), a final removal order is automatically reinstated when the individual reenters the United States "illegally." Diaz did not reenter the country illegally; rather, he was illegally *removed* and then ordered returned so that his application for SIJ status could be granted, which it was. *See* ECF No. 35-3. Indeed, the purpose of § 1231(a)(5) is to effectuate the efficient removal of aliens who reenter illegally after having been removed—to avoid putting the government to the task of repeating the entire removal administrative process. *Rodriguez-Saragosa v. Sessions*, 904 F.3d 349, 354 (5th Cir. 2018) (explaining that Congress enacted § 1231(a)(5) "to expedite re-removal of a person who returns without permission after being removed," and to "invest [the re-removal procedures] with something closer to finality," and finally that this "clear Congressional purpose in [the] unambiguous text") (quoting *Tapia-Lemos v. Holder*, 696 F.3d 687, 690 (7th Cir. 2012); *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 40 (2006)). *See also De Sandoval v. U.S. Atty. Gen.*, 440 F.3d 1276, 1280 (11th Cir. 2006) ("According to the Attorney General, Congress enacted § 1231(a)(5) to streamline and expedite the procedures for reinstating the removal orders of aliens who illegally reenter the

United States."). Congress could have written a statute providing that *any* final order of removal could be automatically reinstated at the discretion of the government, but it did not do so. Instead, reinstatement automatically occurs only when the individual reenters the United States "illegally." Diaz did not reenter illegally, so his order of removal was not reinstated by operation of § 1231(a)(5).

But other terms in § 1231(a)(5) also make it clear that the kind of reinstated removal order contemplated in that provision is completely inapplicable to the circumstances before the Court. That provision clearly states that "the prior order of removal is reinstated from its original date and *is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.*" (Emphasis added). Here, Respondents have filed a stipulation explaining that DHS and ICE have filed a non-opposition to Diaz's motion to reopen his removal proceedings and a non-opposition to his request for a stay of removal before the BIA. ECF No. 28. By agreeing that this order of removal should be reopened and reviewed, and by allowing Diaz to apply for relief as a SIJ (both of which should not be allowed by the terms of § 1231(a)(5)), the Respondents are effectively conceding that, whatever basis they may have for detaining Diaz, it is not by virtue of § 1231(a)(5). Therefore, Respondents cannot rely on § 1231(a)(5) to argue that §

1231(a)(2) and § 1231(a)(6) provide the statutory authority for Diaz's current detention.

A similar result was reached by a district court in a case involving another SIJ status recipient who, like Diaz, was a *J.L.* class member unlawfully removed from the country. *See Primero Garcia v. Barr*, No. 20-cv-01389-NC, 2020 WL 1139660, at *3 (N.D. Ca. Mar. 9, 2020) ("Primero Garcia's request for a stay does not challenge a removal order. Indeed, the immigration court's June 13, 2019, removal order had already been executed."); ECF No. 35-4.

### ii. 8 U.S.C. § 1182(d)(5) and 8 U.S.C. § 1225(b)

Respondents contend in the alternative that even if the order of removal was not "reinstated" under § 1231(a)(5), the original final order of removal may still be said to exist; and if so, that order empowers ICE to detain Diaz under § 1231(a)(2), by virtue of 8 U.S.C. § 1182(d)(5) and 8 U.S.C. § 1225(b). While these two latter sections are not referenced in § 1231(a)(2), the government argues that when ICE and DHS paroled Diaz back into the United States pursuant to the *J.L.* court order, Diaz became present in the United States under § 1182(d)(5) and remained in detention under § 1225(b). ECF No. 32, PageID.527. The Court disagrees.

Section 1225 governs the inspection, detention, and removal of aliens arriving in the United States who seek admission. The Supreme Court's decision in *Clark v. Martinez*, explains this process, as well as § 1225's interaction with § 1182(d)(5) and § 1231(a)(1)(A). *See* 543 U.S. 371,

373 (2005). "An alien arriving in the United States *must* be inspected by an immigration official, 8 U.S.C. § 1225(a)(3), and unless he is found 'clearly and beyond a doubt entitled to be admitted,' must generally undergo removal proceedings to determine admissibility, § 1225(b)(2)(A)." *Id.* (internal citations omitted) (emphasis added). "Meanwhile the alien may be detained, subject to the Secretary's discretionary authority to parole him into the country." *Id.* (citing § 1182(d)(5)). For example, in *Clark* the aliens were granted temporary parole as part of the June 1980 Mariel boatlift from Cuba under § 1182(d)(5) and, until 1996, federal law permitted Cubans who were paroled into the United States to adjust their status to permanent resident. *Id.* at 374 (citing 8 U.S.C. § 1255). Here, Respondents contend that Diaz was granted a temporary "significant public benefit parole" under § 1182(d)(5). ECF No. 15-2.

Section 1182, titled Inadmissible aliens, and subsection (d), titled Temporary admission of nonimmigrants, provides as follows under subsection (d)(5):

> (A) The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or *significant public benefit any alien applying for admission to the United States*, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served *the alien shall forthwith return or be returned to the custody*

28

> *from which he was paroled and thereafter his case shall*
> *continue to be dealt with in the same manner as that of any*
> *other applicant for admission to the United States.*
> (B) The Attorney General may not parole into the United
> States an alien who is a refugee unless the Attorney General
> determines that compelling reasons in the public interest with
> respect to that particular alien require that the alien be
> paroled into the United States rather than be admitted as a
> refugee under section 1157 of this title.

§ 1182(d)(5)(A)-(B) (emphases added). This provision permits the government to temporarily parole into the country an alien who has arrived in the United States to apply for admission. Respondents draw attention to the language in § 1182(d)(5)(A) stating that when the temporary parole is revoked, "the alien shall . . . *be returned to the custody from which he was paroled* and thereafter *his case shall continue to be dealt with in the same manner as that of any other applicant for admission.*" Respondents contend that this means a return to the "status quo," that is, the status that Diaz had back in July 2019, when he was subject to a final order of removal that was ready to be executed.

But that "status quo" no longer exists. To be sure, Diaz's temporary parole, which Respondents contend was effectuated by § 1182(d)(5), expired once his SIJ application was approved. But Respondents' "status quo" argument ignores the operation of § 1255(h), which acts to parole Diaz into the United States as an SIJ status recipient with a current visa who is eligible to apply for an adjustment of status.[5] Diaz cannot be

---

[5] 8 U.S.C. § 1255, titled "Adjustment of status of nonimmigrant to that of person admitted for permanent residence" states, under subsection (h):

"*returned to the custody from which he was paroled*" because his prior custody—as a removable alien with a removal order—was premised on the fact that he was removable under § 1182(a)(6)(A)(i), which is not possible now that a visa is available and he can apply for adjustment of status under § 1255(h).[6] § 1182(d)(5)(A). On its face, any "return to status quo" that could be authorized by § 1182(d)(5)(A) is based on a set of circumstances that no longer exists.

The government also relies on § 1225(b) as a separate source of statutory authority permitting Diaz's detention, but this basis is also unavailable. As explained above, § 1225(b)(1)-(2) authorizes the government to detain certain individuals "arriving in the United States" who are *seeking admission* into the country. *Jennings v. Rodriguez.* 138 S. Ct. 830, 838 (2018). "Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation." *Id.* at 837 (citing § 1225(b)(1)(A)(i); § 1182(a)(6)(C),

---

(h) Application with respect to special immigrants

In applying this section to a special immigrant described in section 1101(a)(27)(J) of this title—

    (1) such an immigrant shall be deemed, for purposes of subsection (a), to have been paroled into the United States; and

    (2) in determining the alien's admissibility as an immigrant—

        (A) paragraphs (4), (5)(A), (6)(A), (6)(C), (6)(D), (7)(A), and (9)(B) of section 1182(a) of this title shall not apply[.]

[6] Further, courts have held that § 1255(h) operates to parole an SIJ status recipient even *before* a visa becomes available because SIJ status individuals likely cannot litigate their adjustment of status applications once they have been removed, and therefore SIJ status grants the recipient a right to remain in the United States while they await the opportunity to adjust status. *See Joshua M.*, 2020 WL 836606, at \*18-19; *Primero Garcia*, 2020 WL 1139660, at \*3-4.

(a)(7)). It "also applies to certain other aliens designated by the Attorney General in his discretion." *Id.* (citing § 1225(b)(1)(A)(iii)). "Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)." *Id.*

Subsections (b)(1) and (b)(2) both authorize detention of aliens. Individuals covered by subsection (b)(1) are ordinarily ordered removed "without further hearing or review" pursuant to an expedited removal process. *Id.* (citing § 1225(b)(1)(A)(i)). But if aliens detained under subsection (b)(1) indicate an intention to apply for asylum or a fear of prosecution, they are referred for an asylum interview; if the immigration judge determines during the interview that this fear is credible, "the alien shall be detained for further consideration of the application for asylum." § 1225(b)(1)B)(ii). Individuals covered by subsection (b)(2), however, "*shall* be detained for a [removal] proceeding" if an immigration officer "determines that [they are] not clearly and beyond a doubt entitled to be admitted" into the country. § 1225(b)(2)(A) (emphasis added). As the Supreme Court in *Jennings* explained, "[r]egardless of which of those two sections authorizes their detention, applicants for admission may be temporarily released on parole 'for urgent humanitarian reasons or significant public benefit,'" citing § 1182(d)(5)(A). 138 S. Ct. at 837.

*Jennings* also rejected arguments that subsections (b)(1) and (b)(2) contained implicit 6-month limits on the length of detention, distinguishing *Zadvydas* and 6-month presumption of reasonable

detention that applies when a final order of removal exists, and the individual is awaiting removal. *Id.* at 842. "Read most naturally," §§ 1225(b)(1) and (b)(2) mandated detention of applicants for admission until certain proceedings had concluded; "[o]nce those proceedings end, detention under § 1225(b) must end as well." *Id.* "Until that point, however, nothing in the statutory text imposes any limit on the length of detention. And neither § 1225(b)(1) nor § 1225(b)(2) says anything whatsoever about bond hearings." *Id.* at 842. "The plain meaning of those phrases is that detention must continue until immigration officers have finished 'consider[ing]' the application for asylum, § 1225(b)(1)(B)(ii), or until removal proceedings have concluded, § 1225(b)(2)(A)." *Id.* at 844.

However all aliens "arriving in the United States" and detained pursuant to § 1225(b) "are inspected immediately upon arrival in the United States  by an officer of the United States Customs and Border Protection" to determine whether the arriving alien has valid travel documents, whether they intend to apply for asylum, or whether they will be immediately removed from the United States. *Pulatov v. Lowe*, No. 1:18-cv-0934, 2019 WL 2643076, at *1 (M.D. Penn. June 27, 2019). Here, while Respondents state that they used a Significant Public Benefit Parole under § 1182(d)(5) to facilitate Diaz's return, see ECF No. 15-2, there is no indication in the record that upon Diaz's arrival in Texas, or when he was transferred to Michigan, that he was ever treated like an arriving alien under § 1225(b) and inspected by an officer of the Customs

and Border Protection. There is no indication whether they asked Diaz if he intended to apply for asylum or if he was traveling into the United States with the appropriate identification. Instead, Diaz's SIJ application was immediately processed and granted pursuant to the *J.L.* court order and Respondents continued to detain Diaz with the expectation of removing him because he did not have a visa available. Of course, that visa *is now* available, and Respondents are not contesting Diaz's motion to reopen. The provisions of § 1225(b), at least according to the available record before the Court, were not followed in this case once Diaz was returned to the United States as ordered by the *J.L.* court. Neither § 1182(d)(5), for the reasons explained above, nor § 1225(b) may be invoked to justify Diaz's current detention. That detention that has not been reviewed or reconsidered by Respondents since the summer of 2019, when he was ordered removed in contravention of a court order.

In sum, § 1182(d)(5)(A) and § 1225(b) do not support Respondents' argument that a final order of removal still exists, authorizing Diaz's detention as of March 5, 2020, when he was returned to the United States via court order in the *J.L.* litigation. § 1231(a)(2). *See also* ECF No. 35-3, PageID.605.

### iii.   8 U.S.C. § 1226

With no authority to detain under §§ 1231(a)(2), (a)(6), or § 1225(b), Respondents contend, in the alternative, that the government's authority to detain would revert back to § 1226(a), which originally empowered the

Immigration Judge to detain Diaz back in April 2019, before a removal order had been issued. This argument is similarly unavailing. First, Respondents offer no authority for the assertion that a pre-removal order of detention under § 1226(a) persists in perpetuity, even after a final order of removal has been entered and executed, the alien has been removed, resides in and suffers abuse in his country of origin, and is later ordered returned to the United States in order to be granted SIJ status. Second, even if the Immigration Judge's original detention determination under § 1226(a) is somehow restored, it is not clear that the jurisdiction stripping provision of § 1226—subsection (e)—would apply in light of Diaz's unique circumstances.

As discussed above, § 1226(e) provides that "[t]*he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review.* No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." Two recently decided decisions from this district identify certain circumstances that may lie outside of the scope of this proscription. In *Malam v. Adducci*, a case on which Diaz relies, the court considered an immigration detainee who was challenging her mandatory detention pursuant to § 1226(c) in light of the COVID-19 pandemic. No.20-10829, 2020 WL 1672662, at *1 (E.D. Mich. Apr. 6, 2020) (Levy, J.). She had been detained in the Calhoun County Correctional Facility since March 4,

2020 and suffered from a number of medical issues including COPD and hypertension. *Id.* She did not have a final order of removal. *Id.*

In *Malam*, the court first determined it had jurisdiction to consider the petitioner's detention under two bases: first, under § 2241 (traditional habeas jurisdiction) and second, under § 1331 (federal question, for bringing a Fifth Amendment due process claim). Under § 2241, the Court stated that habeas corpus was the traditional vehicle for a case such as this, where a noncitizen was challenging the *fact* of their detention. *Id.* at *2 (citing *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) (ruling on the merits of a habeas petition challenging the validity of pre-removal detention)); *see also Thuraissigiam*, 140 S. Ct. at 1969. Particularly in the context of COVID-19, the court confirmed that habeas was the appropriate vehicle for the petitioner's claim, rather than a *Bivens* action challenging conditions of confinement, because she was arguing that no change in prison conditions would be sufficient relief – only release from detention would do. 2020 WL 1672662, at *2.

As relevant here, the court determined that some important jurisdiction-stripping provisions in the immigration statutes did not bar its ability to consider the petitioner's immigration detention authorized by § 1226(c). Section 1252(b)(9) did not bar jurisdiction because the petitioner did not have a final order of removal. Relying on *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), the court held that § 1252(b)(9) did not strip jurisdiction from courts to hear challenges to detention pending

removal because detention was not an action taken to remove the noncitizen from the United States and the aliens in *Jennings* and *Malam* did not have final orders of removal.

Section 1226(e), discussed above, did not bar jurisdiction, because "§ 1226(e) bars federal review of any *discretionary decision* made by the Attorney General regarding detention . . . in an immigration case." 2020 WL 1672662, at *6. Citing the Supreme Court's decision in *Demore v. Kim*, 538 U.S. 510 (2003), the district court explained that § 1226(e) *does not prevent noncitizens from raising constitutional challenges to mandatory detention under § 1226(c). Demore*, 538 U.S. at 517. When an alien is detained pursuant to § 1226*(c)*, that detention occurs without any discretion from the Attorney General – the government is obligated to detain the alien. *Id.* And because the petitioner in *Malam* was only being detained pursuant to § 1226(c), § 1226(e) did not bar jurisdiction. 2020 WL 1672662, at *5.

Unlike Malam, however, Diaz was not originally detained pursuant to § 1226(c), but rather under § 1226(a), like the petitioner in *Perez-Perez v. Adducci*, No. 20-10833, 2020 WL 2305276 (E.D. Mich. May 9, 2020) (Lawson, J.).[7] In *Perez-Perez*, ICE initiated removal proceedings against the petitioner in December 2019, charging him as removable for being present in the United States without being admitted or paroled. *Id.* at *1. He was detained while his removal was pending. *Id.* These are the same

---

[7] *Perez-Perez v. Adducci* is currently on appeal to the Sixth Circuit.

grounds upon which Diaz was detained and found removable. At a hearing before the Immigration Judge, the petitioner conceded he was removable but requested bond under § 1226(a). The judge denied his request, finding he was a danger to the community. *Id.* Later, the petitioner then applied for cancelation of removal. The Immigration Judge granted relief and adjusted the petitioner's status to lawful permanent resident. The government appealed that decision to the BIA, meaning that the IJ's decision was non-final, and the petitioner remained in ICE custody.

The petitioner then filed a habeas petition and temporary restraining order in the Eastern District of Michigan seeking release from detention due to the COVID-19 pandemic and the fact that he suffers from hypertension. *Id.* at *2. The government argued that the court did not have authority to entertain the petitioner's request for relief from detention under § 1226(e) because the decision by the Immigration Judge to deny bond under § 1226(a) was a non-reviewable discretionary decision.

The court found that § 1226(e) did not divest it of jurisdiction. *Id.* Although the Immigration Judge denied bond to the petitioner in January 2020, since that time the judge had granted his petition for cancelation of removal and ordered that he be "issued all appropriate documents necessary to give effect to [her] order." *Id.* In other words, circumstances had changed materially since the Immigration Judge

denied bond. The government argued that because it appealed this decision to the BIA, the IJ's order was not a final order. *Id*. Judge Lawson reasoned that although the appeal was pending, "[t]here [was] not much left to the underpinnings of the discretionary decision to detain the petitioner." *Id*.

The same can be said of the original detention order in this case. When the Immigration Judge in Diaz's case declined to redetermine Diaz's custody status on June 26, 2019, he did so because of Diaz's operating under the influence arrest "along with other criminal encounters," and "also due to the Respondent's apparent lack of relief availability." ECF No. 1-10, PageID.88. This determination was made in ignorance of Diaz's membership in the *J.L.* class action and the injunction issued in that case prohibiting removal proceedings against class members, such as Diaz. Since that decision was made, Diaz's circumstances have materially changed, he has now been granted SIJ status and has a current visa allowing him to apply for an adjustment of status to lawful permanent resident. Diaz now has a relatively clear path to citizenship. As in *Perez-Perez*, "[t]here is not much left to the underpinnings of the discretionary decision to detain" Diaz. 2020 WL 2305276, at *2. Therefore, even if the old order of detention under § 1226(a) could somehow be resurrected to provide authority to detain Diaz, the circumstances of Diaz's life and immigration case have changed so drastically that § 1226(e) does not divest this Court of jurisdiction.

In sum, Respondents have not identified, nor can the Court find a single statutory provision that currently authorizes Petitioner's detention in immigration custody. And to the extent § 1226(a) could authorize Diaz's detention, circumstances have changed so drastically, that the Immigration Judge's detention decision is stripped of much of its underlying reasoning.

## B.    Preliminary Injunction

Turning to the merits of Petitioner's motion, the Court first notes that it will characterize his request as a motion for preliminary injunction because Petitioner gave notice to the government and did not seek a ruling before the government could respond. *See Perez-Perez*, 2020 WL at 2305276 *3 (citing *Ohio Republican Party v. Brunner*, 543 F.3d 357, 362 (6th Cir. 2008)). Federal Rule of Civil Procedure 65 nonetheless governs both. Second, as discussed above, most of the claims in Petitioner's habeas petition and motion have been mooted by Respondents' stipulation that they will not seek to remove Diaz while he litigates his motion to reopen before the BIA and that they will not contest that motion. At the second hearing on the motion, Respondents could not point to any legal reason why the BIA would not grant the now-unopposed motion to reopen. Therefore, for the purposes of this Order, the Court focuses on the single question ripe for this Court's review: whether Petitioner's prolonged detention violates his due process rights.

*See* ECF No. 1, PageID.30-37 (explaining Counts VI and VII of Diaz's habeas petition).

### i.    Likelihood of Success on the Merits

The Fifth Amendment's Due Process Clause forbids the government to "depriv[e]" any "person . . . of . . . liberty . . . without due process of law." "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. That protection extends to aliens present in the country, "whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693. And in *Zadvydas*, the Court commented that "a statute permitting indefinite detention of an alien would raise a serious constitutional problem." *Id.* at 690.

Here, the issue is not a particular statute that arguably permits indefinite detention, but rather unique circumstances where an alien is being detained indefinitely under no clear statutory authority. Count VI of Diaz's habeas petition alleges that his prolonged detention violates his rights to procedural due process, citing *Zadvydas*. ECF No. 1, PageID.30. While the six-month time frame for presumptively valid post-removal detention approved under *Zadvydas* and § 1231(a)(1)(B) has not yet expired, the unique and extraordinary circumstances of this case raise serious issues calling into question the basis for Petitioner's detention. As the Court has explained above, there is no final order of removal

justifying Petitioner's mandatory detention under §§ 1231(a)(2), (a)(6) and Respondents have been unsuccessful in demonstrating any other statutory authority justifying Diaz's detention. If § 1226(a), for some reason, could form the basis for Diaz's detention, "[t]here is not much left the underpinnings of the discretionary decision to detain the petitioner." *Id. Perez-Perez*, 2020 WL 2305276, at *2. Once the Northern District of California judge learned that Diaz had been unlawfully removed from the country, Diaz was ordered returned, and was temporarily paroled into the United States on March 5, 2020, pursuant to a court order. Diaz's SIJ application was granted and a visa became available on July 1, 2020. Respondents are no longer contesting Diaz's motion to reopen before the BIA, and as soon as his case is remanded to the Immigration Judge, Diaz can apply for adjustment of status. Despite this, Respondents believe they are justified in detaining Diaz. By operation of § 1255(h), Diaz has been paroled into the United States for purposes of litigating this adjustment of status. And on the record before the Court, at this time there is no basis under which Diaz could be removed; he was originally rendered removable under § 1182(a)(6)(A)(i). But § 1255(h) specifically provides that Diaz can no longer be removed pursuant to § 1182(a)(6)(A)(i). Respondents therefore have no statutory authority to detain Diaz but have nonetheless kept him in ICE detention since March 5, 2020 and have expressed no intention to release him from detention despite the lack of a removal order.

41

Courts have already described the considerable protections that come with SIJ status. In *Osorio-Martinez v. Attorney Gen. United States of Am.*, the Third Circuit found that SIJ status reflects the determination of "Congress to accord those abused, neglected, and abandoned children a legal relationship with the United States and to ensure they are not stripped of the opportunity to retain and deepen that relationship without due process." 893 F.3d 153, 170 (3d Cir. 2018). And in *Joshua M. v. Barr*, --- F. Supp. 3d ---, 2020 WL 836606 at *14 (E.D. Va. Feb. 20, 2020), the Eastern District of Virginia granted a stay of removal for an SIJ status recipient who had a final order of removal but no current visa permitting him to file for an adjustment of status. *Id.* Despite the government's argument that the district court had no jurisdiction to stay the petitioner's removal, the court looked to amicus briefs submitted by organizations that specialize in litigating immigration cases for children with SIJ claims, to conclude that the protections of SIJ status confer special rights that justified a stay of removal. *Id.*[8]

---

[8] *Joshua M.* recognized the dearth of caselaw surrounding the removal and detention of SIJ status recipients like Joshua and Diaz. 2020 WL 836606, at *22 ("Generally, it does not appear that Respondents frequently remove from the United States individuals who hold SIJ status and lack meaningful criminal history. . . . Infrequent removal of such immigrants, however, aligns with Congressional intent to have SIJ status protect vulnerable youth from leaving the United States and returning to a country where harm will come to them."). The Court takes that landscape into consideration now as it considers the likelihood of success of Diaz's Due Process claims.

Specifically, amici asserted that the respondents would "render SIJ status 'worthless if each Special Immigrant Juvenile is nevertheless subject to removal while awaiting the opportunity to adjust status.'" *Id.* at *9. Amici further contended that "because 'SIJ [status] is revocable only through a procedure proscribed by statute and regulation . . . [Respondents unlawfully] attempt[ ] an end-run around this revocation procedure by seeking to remove Joshua while he pursues an appeal of his removal order.'" *Id.* (alterations in original). Amici further argued that the respondents were proposing "to remove Joshua, and potentially thousands of other Special Immigrant Juveniles who are also [awaiting visas], on the very ground this [SIJ] statute waives—because he arrived in the United States without inspection. Such a removal would violate the statute and subvert congressional intent." *Id.* (alterations in original). "Amici survey[ed] the legislative history underlying the SIJ statutes, including the statutory waiver of certain grounds of removability, remarking that '[e]ach of these congressional actions reflect an unmistakable intent to permit SIJ [status] beneficiaries to remain in the United States to pursue lawful permanent residency, absent independent and legally sufficient reasons to remove them.'" *Id.* Amici also expressed concerns of the possible repercussions of the *Joshua M.* case, pointing out that if the respondents' position prevailed, thousands of children would be put at risk of removal, "despite the protections Congress enacted for their benefit." *Id.*

43

Fortuitously for Diaz, during the pendency of this litigation, a visa became current, enabling him to apply for adjustment of status. Further, Respondents here have conceded that they will not seek to remove him from the United States while he litigates his motion to reopen before the BIA and are not opposing that motion. Despite this, Respondents have been unwilling to release Diaz from ICE custody. Diaz's SIJ status and visa, therefore, are protections this Court must take into account in evaluating Diaz's claim that his detention in ICE custody since March 5, 2020 is without legal ground.

As stated above, the Court is unable to conclude that there is any valid statutory basis for Diaz's current detention. Though Respondents suggest that once the BIA grants Diaz's unopposed motion to reopen, he will then be able to move for a custody redetermination before the Immigration Judge,  Petitioner's counsel at the Court's second hearing on the motion pointed out that it could take several months for the BIA to announce its decision—even though that motion is unopposed. And Diaz was not provided a custody redetermination hearing or otherwise granted an inspection by an immigration official when he was returned to the United States in March 2020. Diaz thus floats in a detention "limbo" while his unopposed appeal to the BIA remains pending. Such prolonged detention by the state on highly questionable legal grounds is precisely what due process and the writ of habeas corpus are meant to prevent. *Zadvydas*, 533 U.S. at 690. Indeed, while *Zadvydas* concerned

the limits on the prolonged detention of aliens held under a final order of removal, it also noted that "government detention violates [the Due Process] unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, see *United States v. Solerno*, 481 U.S. 739, 746 (1987), or in certain special and 'narrow' nonpunitive 'circumstances,' *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992), where a special justification, such as harm-threatening mental illness, outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.' *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)." U.S. at 690. *Zadvydas* assumed that the civil detention proceedings such as those allowed under § 1231 "are nonpunitive in purpose and effect." *Id.* Here, the Court has already explained that it can locate no statutory justification for Diaz's current detention. Therefore, in light of these unique circumstances, the Court concludes Diaz has demonstrated a likelihood of success on the merits of his due process claim.[9]

### ii.    Irreparable Harm to Petitioner

"The alleged violation of a constitutional right is sufficient for a court to find irreparable harm." *Malam*, 2020 WL 1672662 at *10 (citing

---

[9] Diaz also argues that his continued detention in the midst of the COVID-19 pandemic violates his Due Process rights under the Fifth Amendment. However, Diaz fails to present evidence of any medical conditions that place him at a greater risk of serious illness or death if he contracts COVID-19 and his age does not place him at higher risk either. At most, Diaz has expressed a "generalized concern about contracting COVID-19, which is not an 'extraordinary and compelling reason'" justifying release from detention. *United States v. Boykin-Johnson*, 2020 WL 3428975, at *1-2 (E.D. Mich. June 23, 2020) (Steeh, J.).

*Overstreet v. Lexington-Fayette Urban Cty. Gov.*, 305 F.3d 566, 578 (6th Cir. 2002)). Above, the Court finds that Petitioner is likely to succeed on the merits of this Fifth Amendment claim. Accordingly, "no further showing of irreparable injury is necessary." *Id.* (quoting *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984)) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

### iii.   Substantial harm to the public & the public interest in the injunction

When the government is the defendant, the final two elements are condensed into one. *Perez-Perez*, 2020 WL 2305276, at *8. First, these factors weigh in Diaz's favor because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (quoting *G & V Lounge Inc. v. Mich. Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir. 1994)). Moreover, the public interest was injured when the government did not comply with the *J.L.* court's preliminary injunction in the first place. If that order had been honored as it should have been, Diaz would not have been removed from the United States and would have been afforded the opportunity to pursue his SIJ status in 2019. Indeed, it was Respondents' failure to comply with that order that sparked these proceedings. *See Primero Garcia*, 2020 WL 1139660, at *4 (finding that the balance of equities and public interest weighed in favor of staying the petitioner's removal in part because it was "ICE's failure

to comply with this Court's preliminary injunction that kicked off these proceedings").

Accordingly, Diaz has shown that each of the preliminary injunction factors weighs in favor of Diaz's immediate release from detention and he is entitled to injunctive relief. In fashioning the form of that equitable relief, however, the Court must take into account the unique circumstances of Diaz's case and its current posture before the Court. The Court must give appropriate deference to the statutory role of the Immigration Judge in making detention determinations during removal proceedings. § 1226(a). The Court also must give weight to the Supreme Court's holding that immigration detention in post-removal proceedings is presumptively reasonable for six months. *Zadvydas*, 533 U.S. at 701. Therefore, the Court will follow a course similar to that set by the *J.L.* court and will **ORDER** Respondents, within 14 days of the date of this Order, to provide Diaz with a bond or custody redetermination hearing before an Immigration Judge. At the hearing, Respondents must identify a statutory basis for Diaz's continued detention and support their request by clear and convincing evidence. In the event that no such hearing is held within the next 14 days, the writ of habeas corpus shall be granted, and Petitioner shall be released. *See Primero Garcia*, 2020 WL 1138660 at *5 (reaching a similar result in a separate case by the same court that issued the preliminary injunction in the *J.L.* litigation).

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** Diaz's motion for temporary restraining order and preliminary injunction. It is hereby **ORDERED** that Respondents are to provide Diaz with a bond or custody redetermination hearing before an Immigration Judge within 14 days of the entry of this Order. At the hearing, Respondents must identify a statutory basis for Diaz's continued detention and support their request by clear and convincing evidence. If no hearing is held within the next 14 days, the writ of habeas corpus shall be granted, and Petitioner shall be released. In either event, within 30 days of the date of this Order, the parties **SHALL SUBMIT** a joint status report identifying any pending issues before the Court that may require decision.[10]

**IT IS SO ORDERED.**

DATED: September 22, 2020.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

---

[10] Additionally, for the reasons stated in footnote 2, the Court **DENIES** Petitioner's motion to strike (ECF No. 20).